Good morning, Your Honor. May it please the Court. Abby Mullin for Appellants. The District Court held that Ms. Herster failed to present legally sufficient evidence to permit her Title VII pay discrimination, whistleblower, and spoliation claims to proceed to a jury. Each of those rulings was incorrect. Starting first with the Title VII claim, the Court granted LSU's Rule 50A motion at trial, holding that Ms. Herster failed to present a prima facie case of pay discrimination. But in reality, Ms. Herster had satisfied her burden in two independent ways. First, this is one of those rare cases where there is direct evidence of discrimination. Ms. Herster testified at trial that Mr. Parker, the director of LSU's School of Art and her supervisor, repeatedly responded to her complaints about her pay by explaining that her pay was based on the assumption that she was a trailing spouse who would have children and take care of children and be happy. On their face, these statements directly suggest the existence of bias. They betray the sex-based stereotype that women will conform to sex roles and have children and take care of children, and as a result, they'll be of lesser value to their employers. Now, in the court below, LSU failed even to respond to Ms. Herster's argument that she had presented direct evidence of discrimination. Here it has a few responses, but each is meritless. First, LSU says that these statements by Mr. Parker were gender neutral. There's nothing gender neutral about the idea that a woman will take care of children and act as a trailing spouse to her husband.  What if it's a reference to the trailing spouse, not to the have babies and be happy? That was gender neutral. If it was just trailing spouse? I think that would be a different case, but if it's said to a woman, I think based on the types of stereotypes that the Supreme Court has recognized that was in Hibbs about women's subservient role that women play, I think even then it's possible that would be direct evidence of discrimination. But certainly here, where the words trailing spouse were then followed in the same breath with the comments of having children and taking care of children, we know exactly what was motivating the comments trailing spouse that follows with the next words of take care of children, have children. Well, a trailing spouse can be a male also. There was evidence by one employee at LSU who thought that in her mind, the words trailing spouse were interchangeable with something like spousal hire. But Ms. Herster testified that when Mr. Parker used the word trailing spouse with her, he would follow it up comparing her to a specific woman, Jackie Parker, who he also called a trailing spouse. So it seems based on the record that a reasonable jury could at least find that as the words were used at LSU by Mr. Parker, he used those words specifically to refer to women. And at the very least, when those words are followed with statements like I thought you were going to have children, I thought you were going to take care of children, that's direct evidence of discrimination. In the Hibbs case, the Supreme Court recognized this exact type of stereotype. This was from the pen of Chief Justice Rehnquist who was writing for the court. He described the pervasive sexual stereotype that caring for family is women's work. And that's the stereotype that's front and center on the face of Mr. Parker's statements. Now, LSU tries to characterize these statements as subjective, but they're not subjective statements. It's not just what Ms. Furster believed was the motivation of her employer. Her testimony was of statements made to her, admissions made to her, by her supervisor, explaining and admitting discriminatory motive underlying her pay. Now, it may be that what LSU is trying to suggest is that there's a question of veracity about Ms. Furster's testimony. But, of course, under Rule 50 motion, credibility questions are for the jury, and that's not something that would form a proper basis of the decision below. Nor can these comments be correctly characterized as stray remarks. The testimony of Ms. Furster at trial was that Mr. Parker repeatedly explained that her pay was based on these stereotypes. So these are not just offhand comments that were divorced from the challenge employment action. In the words of Mr. Parker himself, pay was based on these stereotypes. And in any event, Ms. Furster presented the kind of evidence that causes statements to be considered direct evidence of discrimination and not mere stray remarks. There's evidence at trial that these statements were routine and made by Mr. Parker, who had influence over her pay. So aside from this direct evidence of discrimination, which was alone sufficient to defeat the Rule 50 motion, there also was the evidence that Ms. Furster was paid less than Mr. Ostrinko, a similarly situated man. Now, LSU agrees that for Mr. Ostrinko to be a proper comparator here, it's the job responsibilities that matter. That's at page 19 of their brief. And the only real way that LSU seeks to differentiate the job responsibilities of Mr. Ostrinko from those of Ms. Furster is to say that Mr. Ostrinko had research responsibilities in his job, whereas Ms. Furster supposedly did not. That is not the evidence that was in front of the jury, though. Aside from Ms. Furster's own testimony that she had research responsibilities, the dean of the School of Art testified that she had research responsibilities. That's at 11781. Mr. Ostrinko himself testified that Ms. Furster had research responsibilities. And even Mr. Monaco, at the time in question, instructed Ms. Furster to, quote, concentrate your efforts on the research aspects of your duties. That's at 12996. Now, Mr. Monaco, of course, is the person whose testimony LSU relies on almost exclusively to say that professionals and residents, as a general matter, have different job duties than assistant professors. But whatever the worth of that testimony on a Rule 50 motion when LSU is the move-in certainly cannot justify the judgment below when Mr. Monaco himself recognized that in the specific case of Ms. Furster, she had research responsibilities as part of her job and instructed her to perform those responsibilities. If I may, I'd like to turn to the whistleblower claim. The only question raised by LSU's Rule 50 motion below was whether Ms. Furster presented legally sufficient evidence of an actual violation of state law. That's the first element of the Louisiana whistleblower statute. And she had. Ms. Furster presented evidence that LSU increased fees or imposed new fees on students without legislative approval, and state law prohibits new fees imposed on students without legislative approval under Article 7, Section 2.1a of the Constitution. Now, LSU does not dispute that this provision of the Constitution applies to it. It does not dispute that it imposed new and unapproved fees on students. It does not dispute that an unconstitutional fee would satisfy the state law violation element of the whistleblower statute. And it does not contend, as the district court seemed to hold, that the Constitution would require some kind of specific intent before there could be a violation of this provision. Instead, LSU essentially argues that fees are exempt from legislative approval if those fees are used for the purchase of consumable art supplies that students use in class. Now, where that exemption exists in the Constitution, or the authorities interpreting it, is unclear. Isn't there very little authority interpreting it? Correct. There's very little. There's one intermediate state court decision. Why don't you address that state court opinion, the final part of it, since it's the only one. I assume we're talking about the same one, Louisiana public authorities. The intent, I don't know if this is the way statutory and constitutional interpretation ought to be done, but under Louisiana case law, you try to figure out what the people meant by legislature first, and maybe the people as well. The intent seemed to be to place legislative control only on fees charged by traditional governmental agencies providing services due and are regulating citizens. And obviously this is about LSU football, which is a special category, unlike probably fees and what your client was dealing with. But nonetheless, there does seem to be a pushback by this one opinion to as broad of an interpretation of fees as you want to give it. Well, so even under the interpretation of fees that was adopted by the majority in that court, which would be that for the Constitution to cover the fee, it would have to be directly related to the education of students. Ms. Herscher satisfied her burden here. The support I was reading seemed to be pulling back from saying it would apply to anything other than fees charged by traditional governmental agencies providing services to and are regulating citizens. And that almost seems to be saying the colleges are not what this amendment was talking about. I don't think the remainder of the court's opinion suggests that, because I think there's an acknowledgment there that fees like tuition, for instance, would be covered because of the role of LSU here in providing the service to students, of providing education to them if they attend the school. So I don't think the court meant to suggest that LSU was uncovered at all, and I think that's particularly clear earlier in the opinion when it makes clear that LSU is not exempted under 2.1b of the statute. So the court makes clear that, sorry, 2.1b of the Constitution. The court makes clear that this provision does apply to LSU. It just pulls back whether it applies to everything. All fees that LSU imposes are just some. And it also follows the, it adopts the reasoning of the AG opinion that we cited in our briefs, and that opinion clearly states that tuition and similar fees would be covered by the Constitution. But what's not covered are things that, under this state court's reading, are things that are extracurricular, basically, or not directly related to LSU's function of providing students education. Here, the course fees, even adopting that interpretation of the Constitution, the course fees would be directly related to educating students, at least some portion of them. They were assessed purportedly to fund students' education in class. And faculty of LSU described these fees as the lifeblood that they rely on for instruction. Now, LSU's argument is that the fees are somehow exempt because they funded consumable items. But that just disregards the evidence that was before the jury in LSU's own admissions at trial. According to the official LSU audit report that was in evidence at trial, a substantial portion of the unapproved course fees went not to fund consumable items, like LSU says, but instead went to fund things like iPads and software and large screen monitors that were purchased for faculty use. So even if we assume the interpretation of the Louisiana Constitution that LSU has proposed to this court, even then, Ms. Herster satisfied her burden on that first element of showing a violation of state law. Now, for the first time in this court, LSU tries to advance an alternative ground to affirm the lower court's ruling on the whistleblower claim. And it does so even though in moving under Rule 50, LSU only cited one ground for its motion, namely the violation of law element. Let me ask you about this. These are four, probably not a Louisiana phrase or a tennis motion, four oral motions made, I think, after both sides rested. Maybe the first motion began after the plaintiff rested. This argument was in their summary judgment motion, which is no longer relevant, so it's not the first time it's appeared. And they did make the argument in earlier motions that whatever that particular claim was, there was no causal relation between that and the alleged injury to your client. I'm just wondering if there's a different rule for these series of oral motions that are relying in part on some of the same ground. Is there any law, if your opposing counsel will tell me if he found anything, is it clear that these sorts of oral motions have the same sort of rigidity to them as a written motion would, that if you've talked about these arguments in earlier motions and that's ruled on, you move on to the next motion, you've got to restate everything for that next motion? Well, so let me be clear first and to say that when this was brought up in the past, it was brought up in the context of a Rule 56 motion. And under cases like Ortiz v. Jordan from the Supreme Court, that Rule 56 motion would not itself be sufficient to preserve it for Rule 50. I'm saying it's not the first time the issue arose in district court, and you wouldn't raise it. And so once we're dealing with the Rule 50 and after both sides have rested, you have these series of motions all dealing with the same ultimate, and most of them, I think, maybe all of them, harm to your client. And only some of the argument was made that this particular point, whatever it is, was not the cause of her dismissal, the cause of the ending of her contract. And it just certainly would have been better if they had restated that for this particular motion too. But I'm just asking, is there any case law, I'm sure you're going to say no, that would say that some of those same arguments, if they apply to the later ones, that there's some flexibility in the rule that you're talking about? May I answer the question? Sure. I've not seen any case law that suggests that there's a lower standard. So Rule 50a says, and the way this court has interpreted it, is that a Rule 50a motion requires the specific grounds for the motion to be stated. And I haven't seen any case law that says there's an allowance for when the motion is made orally rather than in writing, nor do I think that kind of allowance would make sense, because the point, as this court has explained, of this specific grounds motion is to allow everyone, the court and the parties, to know what the alleged evidentiary deficiencies are so those can be addressed. Now, this is not a case actually where the Rule 50 motion was made at the close of both sides, after both sides rested. The Rule 50 motions were made in the midst of trial before LSU had rested. Well, what I saw is that they started after you rested, and then the judge got concerned about keeping the jury waiting so long and only halfway finished, partly finished the first motion, and then went back to the jury. It's correct. That's correct of how it started. And then the motions were renewed and argued towards the end of trial before LSU rested. I think there was one remaining witness. And if I, just to close out the thought, even if the evidence, excuse me, even if the argument were preserved, there is ample evidence here for the jury to find retaliation. I'm trying to see if there's any basis to argue that. And I do think oral motions in series, if these were given one right after another, may raise some different considerations as to why you need to restate everything. But I don't think we'll be making new law in this case. We'll just have to see. Keep going. I see my time is out, so I'll reserve the balance of my time. She's finished the question. No, just had you completed your answer too? I only was going to add here that even if the argument were preserved adequately, there is ample evidence that a jury could find retaliation here. That's what the district court held in ruling on the summary judgment motion, and I'll reserve the balance of my time. Thank you. Thank you. You have your rebuttal time intact. Mr. Dooley. Good morning. Ross Dooley on behalf of the appellees in this matter. May it please the Court, I'd like to first address the whistleblower discussion that is most recently before the Court. LSU, of course, contends that there is no violation of the law, nor that there was any reprisal. And to go to your comments and questions, Judge Southwick, about the Louisiana Public Facilities case versus LSU, the specific holding in that case, of course, was that there was only an attempt to put legislative control over certain types of new fees because of a concern that certain government agencies were implementing new fees using the emergency procedures provision of the Administrative Procedure Act. And it found that Representative Landrieu had put that in there. That was his intent. And the Court goes on in that case, which is admittedly only persuasive authority, and it talks about those fees and it makes a distinction between things that are LSU's purpose or governmental function and things that are not. And it says that if it goes directly to the purpose or the governmental function, such as the delivery of education, then, of course, there would be approval would be needed. But the opposite would be true. The converse would be true, that if it doesn't go to salaries, buildings, things like that, then, of course, there would be no need for the approval. And what it did do was look at a constitutional provision, Article 10, Section 7A, which empowers the LSU Board of Supervisors, and it specifically says, look, we don't want to remove administrative control over LSU's daily activities. So they read these two provisions in Pari Materia, and they say, this is not an all-encompassing sort of situation where every single fee by every governmental agency has to be approved by the legislature. If that was the case, the legislature would be inundated with bills each session trying to accommodate this. Why are you drawing the line between seeking legislative approval and? Well, in this case, we're drawing the line right at what the fees were being used for, which was being used for art supplies for students that they were consuming themselves. The legislative auditor did a very detailed audit. They posited her as probably their store witness on this issue, but the auditor's testimony was primarily in favor of LSU. What it found was, yeah, the students were, in fact, using them. The problem was a lack of internal accounting controls, which LSU absolutely admits. We made a mistake in this situation. We did. A.G. Monaco, who was the dean of the art school, said specifically this was an accounting error, and that's what the legislature's auditor's findings are very specific. Six things in particular, automated overrides, all of which were accounting functions. But the dean also said this was really an error on the part of the Division of Administration and Finance. This was not even something that's attributable to the School of Art. They were just really following the instructions we gave them and also the instructions of the bursar in how to go about taking these fees. What were the students using them for? Were they using them for paint, clay, things like that? There's been no testimony that they were being used for anything else. And more importantly, there was absolutely no evidence whatsoever that there was any faculty were using these for their personal benefit. They bring up monitors. They bring up iPads in their briefs, and they talk about this. But the final decision, the final outcome of the findings was that every single iPad, every single monitor was accounted for, no criminal charges, no misappropriation of public funds. And they did certainly start very broad in terms of the scope of what they claimed that the School of Art did. They said, oh, it's theft. It is misappropriation of funds. But they dropped that. They're not looking at that on appeal. Are those the allegations by Hurster? Yes, that is correct initially. Why she got involved in this. That is correct. As to why she got involved, I'm sorry, Judge Clement, you're asking me? She was in the art department, right? That's correct, Your Honor. So why did she get involved in complaining about the status of the fees? I think the complaint, Judge Clement, to be quite honest with you, is just part and parcel of a long series of complaints she asserted against the School of Art, which quite frankly underlie the pay discrimination claims as well as the spoliation claims. It started from day one. Was her review scheduled as a result of this complaint? It was not. There is no timing there. There was not. It was four faculty members were up for review. Now, we have to consider the time frame in this. The end of February, we have finals that start in May. You have essentially a three-month period. The faculty review, that first meeting in which they did do a review, was on March 21st. There was uncontroverted evidence that Mr. Park, who actually set this meeting up, Mr. Park, rather, her boss, who said that this review has to go forward. They have a certain amount of time. They've got to go ahead, vote on it. They've got to accommodate the fact that there could be some appeals of those decisions. And that's precisely what they did. But whatever intent you may supply to setting the meeting, which admittedly was on the day after he received notice that the course fee situation was brought up, the fact is you had 22 people, 22 who were on this faculty appointment committee, each of one who voted, and every one of which said, when I voted, the course fee issue had not been talked about at all. That evidence is uncontroverted. Every single witness that got on the stand said, hey, we talked about it to say not to talk about it. In fact, they showed a great deal of restraint under the circumstances, especially since the day of the meeting, Ms. Herster emailed every faculty member, and she says, hey, this is what's going on. We're talking about good faith and moving forward. I don't think that was necessarily good faith on her part. But each person had the restraint, and they said, we're not going to talk about it. We're not going to consider it. And that's precisely what happened. She got voted significantly. Counsel, what do you say to the argument, though, that we can't, on the whistleblowing at least, consider that because it wasn't part of the Rule 50 motion, that all we can consider is whether the argument you made was correct, that these fees would not be covered by the constitutional provision, and thus there was no violation of state law? Your Honor, as standing here, I'm not prepared to cite you any law that would support our position.  But it is. It was part and parcel of the evidence that was before the court at that particular point in time. LSU has never backed off of its position. They saw the opportunity to make that Rule 50 motion, and I think it was just the ongoing proceedings. The plaintiff certainly had noticed that our position was that. I'll write the transcript pretty closely. Would you agree there's nothing in that motion that's relying on there's no causal relationship between the whistleblowing? Would you agree with that? Yes, Your Honor. The argument was not made? Yes, Your Honor. All right. As I watch the clock tick, I'd like to turn to the spoliation claim, which is somewhat related to the whistleblower claim in that the absence of any sort of intent to deprive Ms. Herster of evidence. There's no dispute that Mr. Arp, who chaired that meeting, shredded those notes. But there was never any order prior to that meeting for him to preserve them. And even after the meeting, there was no instructions from HR or anyone at LSU to shred them. HR and its legal staff has taken a very consistent position post-meeting, and it says, We believe these to be your personal notes, and you can do what you will with them. And that has been Mr. Arp's custom, his policy for years and years. There were four people that were reviewed at that meeting, and he destroyed each of those notes. But only after that appeal had become final. Is he the one in those meetings, not just hers? I mean, is it the routine for that meeting that any kind of notes are taken, or recording, or any kind of preservation of proceedings? The only preservation of the proceedings, Judge Stewart, would be the report that is required under LSU's policy PS 36NT, which says, look, this is what you've got to tell them. You've got to tell them who was there. You've got to tell them what the tally was, were there any reasons or basis behind the decision. That's precisely what he did. But there's no requirement that during the process that any, quote, minutes, as we know it, or notes, or whatever, are to be taken. In some situations, you know, quote, minutes are taken, detail, et cetera. At others, they're not. And I just wondered in this, not necessarily whether in her case, but as a matter of routine, there was any rule, policy, or whatever that prescribes that when you're meeting to decide X, you know, there must be any kind of notes. Or was it just Mr. Arps, who's like a lot of us, wherever you are, take notes? That's correct. There was no requirement that he, in fact, memorialize the discussion into notes. That was only the requirement of the report. And I'll add to that, had Mr. Arps said the reason I took notes was because I don't have a really great memory. I don't have an eidetic memory is how he described it. And he did, and he said that's why he took notes. And I guess if you can extrapolate from that, what if he would have had that sort of memory? Certainly the memory itself is not a public record. But also I don't think you could find here that there would be an affirmative duty for him to regurgitate his memory, to make notes, and then make a report. The notes serve strictly to connect his memory up to the report. And there's never been, there's no policies or anything that the plaintiffs can point to that would contravene that. That particular meeting, it resulted in a 15 to 5 vote with two abstentions. And when Ms. Hurster really wasn't satisfied with that particular outcome, she did appeal. Now what she, they do argue here. They said, well, LSU exerted control over this process. And they point to an e-mail by the dean of the school, I'm sorry, dean of finance administration, A.G. Monaco. And what they do is they excise a critical sentence in that e-mail. This is right after the meeting. I'm going to take it right out of the quote they give you in the brief. And this particular quote says, this is not right. And what he says is she has no right to surreptitiously record conversations, to harass and threaten other people. And that's precisely what had happened in this post-meeting atmosphere. It escalated at her hands to really an nth degree. Tell me this. Assuming for the sake of my question, we were to determine that the district court erred on the spoliation claim and reversed on that. I mean, what happens? I mean, I know there is, with spoliation in Louisiana, A, an adverse presumption if you're in trial, B, some discussion about an independent tort for spoliation. But I'm just sort of curious in this context, and I'm not saying you are, but for the sake of my question, if we were to reverse on the spoliation issue, I mean, what happens? The trial, at least the jury trial, is over. Nothing happens, Judge Stewart, because there's no other evidence ever elicited by any other witness that would say what was on those notes is any different than the discussion that was actually had at the meeting. There is nothing else. She had ample opportunity. Every witness that was put on the stand said the same thing. We didn't discuss it. It could be set down, I suppose, but she would end up at the same destination because there is no other evidence. And not only was there no other evidence, she failed to bring her own witnesses if she thought there was other evidence. She did not bring, call anyone else, didn't take depositions of anyone who would have been at the meeting and said, you know what, we said something other than what these witnesses say. And your notes would probably reflect that. But there were no such notes. What about the other people being reviewed with her that would their information have been in these notes also? That's correct, and they were likewise shredded. Were there any complaints by them? None. Not only were there no complaints, Judge Clement, but there was no evidence that Mr. Arp ever kept any of his notes. None. There was never a situation where they said, look, there's an LSU file we want. Here's a past employee you looked at in this committee, and oh, there are your notes. There were no such notes ever to be produced because every one of them was shredded over and over again, and that was his particular custom and policy for dealing with those discussions. The last point I'd like to, of course, address would be the pay discrimination issue and start first with the biased comments, and she does identify four specific statements, the first being a trailing spouse comment on its face, gender neutral. It's her husband in an email to the director of the art school used a spousal hire in an email to him. I know they're different sort of phrases, but they mean exactly the same thing. They're synonymous. Ms. Herster herself, she testified about being a dual hire. She identified herself in some ways being connected to her husband relative to the position she took, and in fact, the only reason they chose this was because it accommodated that situation. My husband's a professor at the law school, and look, I'm here too, and I'm an artist, and they looked at her resume and they said, hey, you're very qualified. Let's take you on, and in fact, she even received a professional development fund from the LSU law school that she was able to use relative to her teaching duties. Perhaps it may be in there, and I forgot to ask the counsel opposite. Had Ms. Herster had a prior academic position in art in another institution before coming to LSU? She did, Your Honor. I'd be hard pressed to tell you the specific school. I didn't memorize it, but she had even similar duties at other schools of art, and I don't think LSU is saying she was not a talented instructor or a talented person in the field of art. What they really did have a problem with was the fact that she didn't want to teach the classes. She signed a contract that says, very specific, this is what you need to do. You've got to teach three classes a semester, and she just wouldn't want to do it. Day one, the first week, emails to her boss saying, I just don't want to teach three classes. Not only does she not want to teach three classes, I don't want to teach this course, digital photography, which she was hired to teach, and this started from day one, and that goes to the temporal proximity of those comments in her petition. She identifies those comments as being one meeting in October of 2009. The rest of it is a series of extrapolations in her mind and that she regurgitated over and over again in emails, which of course is replete through the record, talking about these comments. No, they're very remote in time from any adverse employment decision that she could be alleging to have taken place. Years. In fact, the next employment decision that was made after these purported comments was a promotion. More pay. A lot more pay. $16,000 more pay. When she could not be satisfied about her schedule and the teaching, what did Mr. Parker do? Did he act as if he was someone who was decidedly trying to discriminate against her based on her gender? No. He accommodated her. He said, look, I'm going to go ahead and let you lighten your load. I'm going to let you teach two courses instead of three, but I'm going to have to give you some extra duties, and these are the extra duties. That's what she's saying is makes her not a comparator to Mr. Estrenko, which is the only witness that they've put forward on this appeal as being a comparator. And they weren't the same position. Mr. Estrenko started out at the same position she did, making exactly the same pay. What happens next? For the academic year 2011, a non-tenured position comes open. For a tenured track position comes open. Mr. Estrenko applies. She does not. She simply did not apply for the position, and she would be hard-pressed to stand here today and argue. I'm being discriminated against because of my gender. Look at what you're doing. Look what you're giving, Mr. Estrenko, when she never even applied for the very position, which should cut it at its knees right off the bat. And when you look at the differences, even if you say, well, there's some reason, some discriminatory reason we're going to attribute to LSU for her failure to apply for the very position that she's complaining about she doesn't have, you have to look at the differences. She says, well, titles don't matter. I can assure you they matter to her. The record is replete with references to wanting to have that title, but really not wanting to do the work. That is the problem. And those statements about acting like a princess, that was made right on the heels in 2009 of her failure to follow through in her contractual obligation to LSU to teach those courses. What he's talking about has nothing to do with gender, and that's the only gender-specific term we could look at. He's not talking about gender. He's talking about the fact that she won't follow through. She's acting as if she has a sense of entitlement. The fact is you get a job, you go to work, you do what you've been hired to do, and she would not do it. And in spite of that, I commend Mr. Parker because what he did was he had tried to accommodate her. Gosh, he gave her a promotion, recommended to the faculty, this is what we're going to do, we're going to pay her more. And they begrudgingly gave it to him, quite frankly. It wasn't a unanimous vote, even though here's a person. What does he get repaid with? He gets repaid with an EEOC discrimination suit. And the next year, 2010, she shows up with this new professional in residence title. And again, we're back to square one. Don't want to teach this class, don't want to teach that class. Her emails say, no way, not going to do that. What does he do? Again, tries to placate her, tried to placate her. Put her into this area coordinator position because, quite frankly, he had to justify to the dean. Look, we're paying her more. We've got this title. Staff doesn't like it, but she's got to do something aside from teach the two classes, and she would not do it. And when she runs into a scheduling conflict with Ms. Celentano, what does she do against her? She files a grievance against her. This has been a series of grievances aimed at nothing. This has nothing to do with gender. This has everything to do with a person who is not following through with the duties that they contractually bound themselves to handle on behalf of LSU. And I see that I've got 20 seconds left, so. Let me ask you, do you concede that there are, is it your position that there was no value to her whistleblower complaints about the fees, or do you acknowledge that LSU should have gotten approval from the legislature? We do not acknowledge that they should have gotten approval. Absolutely not. This is a fee that is within, it's just an ordinary fee. We're talking about art supplies for students that they're consuming. Would you say that the attorney general's interpretation would require these fees to be approved by the legislature? No, Your Honor. No, Your Honor. Because they specifically go to the essential, the governmental purpose, the function of LSU, and that's to provide, deliver an education to students. The students themselves were consuming the fees that we're talking about at issue. And again, this is the most the auditor could say was, there's been a policy, there's been a problem with the policy. We did something wrong, we admit it. That's why we have auditors. They're there for that reason to pick up on this kind of stuff, so. All right, counsel. Thank you. Back to you, Ms. Small. No, you're not done yet. Well, we haven't had that to happen in a while. But you're not the first. So let me just clear up the record on a few things first. Judge Southwick, with respect to your question on the opinion from the Louisiana Appellate Court, I just wanted to draw your attention to this one. This is at page 18. The court says, the legislature has evidence, no intent to have oversight over fees with respect to LSU, other than those fees directly connected with LSU's principal governmental function of providing higher education to the citizens of the state. So even if we assume the course fees here were all spent on materials that were used in class as part of instructing students in class, they clearly would be directly related with LSU's function of providing higher education to students. Is there any evidence that any university goes to the legislature to seek approval of fees such as this? Well, yes. LSU's current policy states that these types of fees have to be approved by the legislature. If you'll give me one second, I'll give you the cipher that is in the record. That's at 11.542.544. The current policy of LSU, subsequent to Ms. Herster bringing this problem to LSU's attention, makes clear that course fees, including for things like art supplies, require legislative approval. That's not something that LSU is focused on here. Instead, they've focused on an argument that somehow consumable supplies are exempt. But their own policy now makes that clear. Now, we heard- Let me ask you this. If you-and I'll ask it quickly so I don't burn your tongue. I assume for the sake of my question, you lose on your gender claim, you lose on your spoliation, but you win on your whistleblower claim. Come out here. What do you get? You win a trial on the whistleblower claim. On any of these claims, if we win on any of these claims or all of these claims, there has to be a trial on whichever claims are remanded to the court below. And that includes spoliation to the question that you asked to my friend. Now, I think we heard a statement that there is no finding that the course fees were used on things like iPads. I just want to read for you from the audit report, and the auditor testified to the same point at trial. A sample of purchases which were made in fiscal year 11 and fiscal year 12 identified approximately 20,000 in purchases that were funded with course fees. However, the items purchased were not used in accordance with the school's policy. These items included but were not limited to iPads, large screen monitors, Mac mini devices, et cetera. All items were purchased for faculty use. That's the finding in the audit report that the chancellor signed off on. That goes to your question, Judge Clement, about why Ms. Herster got involved. She got involved because she was concerned that money was being taken from students inappropriately. One of her claims below was not only was this in violation of the Constitution, but it was actual theft. And we haven't pressed that here because the constitutional violation alone is sufficient for purposes of her whistleblower statute. But Ms. Herster was acting to protect her students and out of their interests and in their interests. Who did they pay the fee to? I'm sorry? Did they pay the fee in class to her, the professor? My understanding is that they signed a form in class. They were told they needed to sign a form in class. That form was then submitted to the bursar's office, and somehow that caused the fee to be charged to them. Subsequent to Ms. Herster's reporting of all of this, students received reimbursements of fees based on LSU's recognition that the fees should not have been collected. I see I'm running out of time quickly, so if I may, I just want to address a few other comments quickly. On the issue of retaliation for the whistleblower, whistleblowing activity, assuming that's preserved and that's a question that this Court can reach, it's at least disputed whether Ms. Herster's review was preordained. It was not required as a matter of policy. Under LSU's policy, Mr. Parker could reappoint Ms. Herster for a year, another year appointment without any action by the faculty. He had done just that in the past. And what he had told Ms. Herster about this year in which the faculty review actually happened was that she would have a performance review, not a full faculty review. And the evidence that she testified to at trial, let me just get the sites for you, was that this kind of performance review was a one-page form that a supervisor would fill out, not the kind of full-blown faculty review that she actually had. Her testimony on that is at 12.412-13 and 12.628, so there was at least a jury question on that issue. And I see I'm out of time. Thank you very much. And we respectfully request that the judgment below be reversed and that each of these claims be remanded for trial. All right. Thank you, counsel, in both cases. In this case, the case will be submitted. Before we tee up the last case for the morning, we'll take a break.